Good morning, counsel. Thanks for joining us today by way of zoom. So the first case we have is docket number 2304 United States v. Kirschner. And sir, am I pronouncing your name right, Laurie? It's actually Lockery, your honor. Lockery. Yes, yes. Good morning, Mr. Lockery, whenever you're ready, sir. Very good, your honors. Please, the court, I would, I represent Jonathan Kirschner in this case, and I would like to reserve two minutes for rebuttal. All right, go ahead. Thank you, Jonathan Kirschner. Excuse me, I'm sorry, battling a little bit of laryngitis, but I'll do the best I can. Jonathan Kirschner sold a very small number of counterfeit coins from his collection. In an investigation that spanned a number of months. I think the government proved up three or four transactions, which led to a, an actual loss calculation of a bit north of $14,000. So Mr. Lockerty, we're familiar with the facts. I think it'd be in everybody's best interest if you focused on a loss calculation. Yes, why don't you address that argument. First, what issues you take. Sure, the, the, the loss calculation really in this case depends upon the, the so called intended loss that the sentencing court found. And that's the concept of intended loss, obviously has a definition in the application note. It means the pecuniary harm that the defendant purposely sought to inflict. Now, what, what the sentencing court did, I would call adjudication by assumption. The court assumed that because Mr. Kirschner had many, many coins in his collection and some of them. If they were genuine would have been in the stratosphere of a value of a counterfeit coin. The court assumed that he would at some point in the future, attempt to sell all of those coins, and further that he would attempt to sell them for a value approximating what the government expert at the sentencing hearing testified to. And that's really an made that made an assumption a further assumption that Mr Kirschner knew what those values would be. Those are all assumptions that the record really does not justify a finding about. Mr Kirschner never attempted to sell anything beyond these very low priced coins that he that he marketed and the actual transactions we know about. The present report said that there were records found in search of his house. That suggested a much larger number of sales but the average value on those sales according to the government's calculation was $90 per item. And when we have that as the factual background of what Mr Kirschner actually did. There's really no basis to take the leap from his actual, the actual losses he attempted to or that he actually inflicted, and to a point where we go up to $35 million, and even north of $35 million to suggest that that was his purposeful subjective intent to. Are you suggesting that the law should be capped at the at the amount of $14,600. Well, what, what I think I have to suggest given that the presentation that the Defense Council made at sentencing is that they, they had their own expert report, where they came up with what that expert thought were some reasonable values and I think it was $1.2 million that that expert came up with. And that was the proposal that the defense made at the front of the sentencing court so I'm not sure that I could do much to depart from that. But that obviously was a far cry from the 35 or $44 million figures that the government and the court were dealing with and ultimately that the court imposed. Mr Lockery, let's let's say the district court found based on the evidence that Mr Kirschner intended to sell the all of his coins, including the super rare ones, and that he intended to sell them for as much as he could get. What's on with with that established, how's it unreasonable men to infer that the correct number is 35 or $45 million. Well, we don't know that Mr Kirschner had any information about those super high values. He didn't have an expert in tow to tell him the history of the complicated history for example of the 1933 St. Gaudens $20 coins, the one that was sold to King Farouk of Egypt for $7 million. He may or may not have known those things but there's no evidence in the record that he was even aware of those valuations. So, how can we then say that that's what he intended. That's the loss he intended to inflict. And that will be under this application. If his intent was, I'll sell them for as much as I can get. Then the question is how do you put $1 amount on. And why is it unreasonable, why is it unreasonable for the district court to do it the way that it is. Well, it took the experts testimony, but of course that experts testimony was, you know, actually it was quite a lot of cross examination about it and whatever inferences the judge drew from it. It seems a great leap from that inference that the expert came up with some kind of a reasonable view based on his decades of experience in the numismatics field that that somehow would be within the consciousness and within the awareness of within the intention of Mr Kirschner. And what we're trying to do here is to penalize wrongful intent and to penalize it to a sensible and reasonable maximum, perhaps, but how to translate that experts view of these particular coins. I think there were probably 12 coins really an issue here the nine coins that were $2 million apiece according to the expert and three that were 8 million apiece. How to translate that into an actual intent subjective purposeful intent by Mr Kirschner. I think that's a chasm one cannot cross. That's, that's my sense of it. That is your judge. But you're not quit are you quibbling with the government's experts calculations. The judge accepted those calculations. Except for those calculations as well I will point out that the Defense Council, I think in a very able way, showed that there was some unrealistic kind of assumptions that the expert was making for example, the expert had to concede that nobody was going to most likely sell one of these coins out the back of the car, out of the trunk of one's car in a public parking lot. We have a, an expert who comes in and says well the sale of these kinds of multimillion dollar items generally either happens through some kind of rarefied atmospheric public auction at Sotheby's or more to the point, some kind of private sale at the upper levels of coin trading with all kinds of experts in place to to ferret out fakes and that these would have been easily ferreted out. And there was really no evidence that Mr. Mr Kirchner had any access to that level of activity that that sort of stratospheric part of the kind of a coin market that simply was not the playing field in which he was playing. And I think that the expert conceded that. So what we have. Wait a second, you complain about discourse instabit but you didn't offer an alternative at sentencing so if we remand. How can the district court possibly figure out a number. Well actually the defense attended an expert's report during the sentencing. And it's in the record it's in the appendix that report assumed that he planned to resell them as acknowledged replicas. Let's assume the district was reasonable in finding that he plans to sell them as genuine coins you didn't offer evidence of what that valuation would be. I think that's, that's correct. I think that's probably correct. I'm not sure the defense expert reach that far so how's the district court supposed to find this out on remand if we if we say it's reasonable for the district court to find that he meant to sell these as real. What's the district court supposed to do if this is a clear error than what wouldn't be a clearer. I'm sorry, could you repeat that you're on I didn't quite get that. Assume that the district court is reasonable in rejecting your contention that he intended to sell these as replicas, and the district court was not clearly erroneous and finding he intended to sell them as real coins. The only evidence you tendered was how much they would sell for is authorized replicas. So, if we remand and we say a 23% haircut is not a reasonable methodology. How can the district court figure out a number on remand, if they're not taking your number in the report they're not taking the government's 23% haircut. How's the district court supposed to figure out how much selling these coins as genuine how much that lost figure would be. I think it's a very difficult Aaron for the district court. And I think the difficulty of that Aaron, there may not be a way to do it fairly in this case, the difficulty of that Aaron illustrates the unfairness of saddling this defendant with this level 22. Well, it was when you add all the guideline levels in the exceedingly high guideline range that came from this $35 million figure when there's really nothing but speculation for people to engage in terms of what would be a, the purposeful conscious object of the defendant, and all these circumstances I don't think this record allows that kind of calculation it's not. After all, the government has the burden of proof, and I think one of our cases says that the defense in these cases may have some burden of coming forward but in the end the government has the burden of persuasion. And so, this is not a case that lends itself to that kind of outcome. We've adopted a burden shifting framework so the government has to make a prima facie case. Once it does that, does your client, then have to come forward with evidence of what his intent was or is it sufficient for him to just poke holes in the government's prima facie case. I think it's, I think it's sufficient for him to poke holes in the government's prima facie case and illustrated shortcomings. And I think it's the Mims case, I have it written down here somewhere, where the Third Circuit has said that even though we have some responsibility on the part of the defense to raise issues in the end the government has a burden of persuasion that does not go away. Do you accept that the government has made its prima facie case? I don't know I think I think the evidence that they brought forward under the appropriate legal standards and in terms of the application note does not touch the issue of what Mr. Kirchner subjectively intended with respect to this. All these other coins 35 million people buy these. It's not not a, it's not a crime to buy these counterfeits, it's not a crime to have them. It's crime to market them he never did. He never offered them to anybody. And so we're essentially penalizing him for something that he never even made an attempt to do and remember this is a, the highest level of criminal intent under our law I think that Judge Gorsuch, when he was Judge Gorsuch in the 10th Circuit in the Manitow case made clear that the words of this application don't have to be given a normal and ordinary meaning. And what that leads to is the requirement that the government show an absolute conscious purposeful object to inflict this particular level of pecuniary loss even though the defendant did not succeed in doing so. It seems to me that, to illustrate my point here I would reflect for a moment on a case like the Jeevers or Jeevers case which is the Third Circuit case. In that case, the defendant had deposited written and deposited bogus checks for I think up to $2 million in a variety of banks and it was a check cutting scheme basically. In the end he attempted withdrawals of $400,000 he succeeded to the tune of $160,000 and at sentencing there was a contest about what ought to be the intended loss if you will and the court said well we're going to put that at $2 million because that's the level of checks. That's the amount of the checks he wrote. He wrote those checks and he deposited them in the banks. He took these affirmative steps with respect to those items that would add to that figure. Mr Kirshner never took any affirmative steps with respect to these counterfeit coins of the where the genuine variety was in the millions of dollars of worth. He never took any affirmative steps with those. Isn't it true that his bail was revoked for taking affirmative steps for violating. Isn't it true that his bail was revoked for violating the terms of a supervised release it was tethered to coin trading. There was a violation and my recollection of that is that he engaged in some kind of activity, either trying to make another sale or at least gathering some materials to do so yes I think that's correct. Once again though I don't think I don't think that would happen there is much to do at all with whether he ever had a subjective intent to try to carry off a $2 million sale of one of those $1 coins or $8 million sale of the 1933 St. It doesn't seem like there's any evidence of him ever making such an attempt. All right, I didn't get him in shouting distance. So I think we understand your argument we'll have you back up here on rebuttal soon. Very good. Thank you very much. Thank you. Is it Miss Lorimer. Yes, it is your honor. Thank you. Good morning. Good morning. May please the court. Excuse me, that's my time. United States Attorney Molly Lorimer. Do you want to pick it. Do you want to pick up your timer. Oh, it's all right. Thank you. So, first of all, I think, given your honors questions, it's, it's important first to see what the appropriate standard of review is here. And that is as some of your, your honors previous questions suggested clear error. This is a factual determination. And this court's prior cases are quite clear that the determination of an intended loss amount is a factual determination. And it's reviewed on appeal for clear error. Let's go to that. Let's talk about the record. Is there any evidence of the record that Kirshner knew the value of the most expensive coins. No, your honor, I would say that there is not specific evidence of record that he knew the value of the very rarest. All right. Any, any record evidence that he planned to auction the fakes as opposed to sell them in a Costco parking lot. No, your honor, we, his modus operandi was not to engage in fancy auctions. Any evidence that he thought his coins could fool an expert authenticator. Well, certainly we do have some evidence of that, your honor. He didn't just import these coins in and of themselves. He also imported them with very sophisticated packaging packaging that the expert who testified at sentencing testified was in fact so sophisticated. That some experts were unable to determine that the coins were in fact fake and they use it at a museum exhibit. So that might help you on value, but there's a problem with that also supporting sophisticated means enhancement, which requires the defendant intentionally engaged in the conduct, but he didn't create this packaging himself. So, so maybe that helps your valuation, but that causes some problems for this. If it's the basis for the sophisticated means enhancement. Well, certainly your honor, although he didn't create the packaging, he used it and he used it in his fraud and he used it to do victims. Additionally, he did. If, if your honor would like to talk about sophisticated means, he set up false business entities. You've got some other bases, but this one there's room for arguing whether he engaged in the packaging or just use someone else's. Let's go back to valuation. Any evidence of the record that he thought he could get a 23% discount, even as the market value increased a thousand fold. Well, your honor, what we have is only his past conduct and what we have from his own invoices and from the sales that he actually conducted with what I'll call the live victims was that he took approximately 23% off the fair market value when taken as an aggregate. Okay. Let me go to another issue on loss. Why should Kirshner's sentence turn on as intended loss? The text of the guidelines just says loss. The commentary refers to intended loss. And as you know, you know, we just had the Nassir case. Now we have these Kaiser deference issues. How is it that intended loss is a reasonable interpretation of loss? So, your honor, I don't wish to sidestep that question, but what I do want to say is this with respect to the Nassir question about a conflict between the application notes versus the text of the guideline. As your honor may be aware, Nassir came out well after briefing. Well, not well, but several weeks after briefing was concluded in this case, that question of interpretation was never raised before the district court and it wasn't addressed in any of the briefing. All right. So there's a forfeiture issue here. Maybe it's forfeited. Maybe it's not preserved properly. If it were, would you argue that it was a reasonable interpretation of loss? So, your honor, I would. I would argue that it's reasonable. But what I would request is that we be given an opportunity for supplemental briefing on that issue as it is new in light of Nassir. Right. And we might or might not have to reach that. You know what? OK, that's helpful. On the valuation question, Judge Bibas asked about the 23 percent discount. And your answer was, well, that's what he sold his previous coins for was a 23 percent discount. But can you explain how it's reasonable to to just carry over that 23 percent discount from $100 coins to multimillion dollar coins? Why is that? Why does that translate automatically? Well, I wouldn't say that it translates automatically, your honor. But what I would say here is that here on clear error review, what we have to do is look at whether what the district court did was reasonable, given the evidence that the district court had in front of it at the time and the arguments that were made to the district court at the time. And what the district court had was, as your honor noted, a burden shifting analysis. The government came forward with a cream of fashy evidence to prove by a preponderance of the evidence what this intended loss amount was. And I think it was a reasonable way of going about attempting to make that calculation. The government. Yes. Really, that's the nub of my question. Well, I'm I don't I don't I'm not sure I agree with you that it was reasonable. So can you explain why it was, especially when our cases say at this very point in the analysis, the district court has to get into a deeper analysis. I can you. I'm not sure I see the deeper analysis here, but maybe you can help. So what I will say is that the record before the district court, we didn't have, as my opponent points out and as Judge Bibas points out in auction, we didn't have a completed attempt or a near attempt to sell the very most valuable of the coins. So we had to and the district court had to extrapolate from the evidence of record that it did have what the appropriate valuation would be. And what the district court did was not just guess. Let me stop you there for a second, because that's that's where I'm having an issue. So the record, as I understand it, were a couple of sales in the parking lot of a Costco. To literally selling out of his car and folks would meet him in a box store. Was it a reasonable extrapolation? And the judges, as I remember, the record said that that established a pattern of sales. Is it reasonable from that pattern of sales in a box store to extrapolate that this individual had the ability, intent, whatever, to sell coins to Saudi royals? So, Your Honor, what is that a reasonable is that a reasonable leap of faith? So I believe it's reasonable here only because we have the issue of impossibility, as noted in the application notes of the of the guidelines. And the district court was faced with a situation where, although it might have been literally impossible for Mr. Kirshner to sell a coin for eight million dollars. We have a situation where, as the case law from this circuit states, I believe it was givers. There's impossibility, but that doesn't mean an expectation, but that doesn't mean he's not going to try to get as much as he possibly can. Just because it's impossible for him to get it doesn't mean he's not going to try to get as much as he possibly can. And so it's reasonable, then, to assume he was going to take just a 23 percent haircut on the potential sale as impossible as it might be of these coins. Correct, Your Honor. At least under the text of the guidelines as supplemented by the commentary. What if we disagree that the 23 percent haircut is reasonable? What would you do on remand to establish a more realistic valuation? Well, I think that the record might have to be supplemented. If Your Honor disagrees with the mechanics of the calculation, I mean, I think that leaves us in quite a difficult pickle, Your Honor, in that these types of mechanical evaluations really are the domain of the district court with all of the evidence before it. And, you know, if we want to come up with some other method of calculation or some other type of calculation, I'm not sure that we're able to do that on the record as it currently exists, and that was the record before the district court. Since what we're doing here is evaluating whether what the district court did was reasonable, I think we're a bit stuck with that. Okay. Well, let's say we vacate and remand. Do you have another way you could establish valuation? You have an opportunity to add more to the record. I don't know, maybe you don't know, but if you have any thoughts on what you would do. Well, you know, what I would do, Your Honor, is put forth the same calculations in that it's my job here on appeal to attempt to uphold what the district court did here. I think given the expert evaluations, I'm not sure what other recourse the district court had here. Unless you wanted to just simply exclude those extremely valuable coins altogether. And that didn't seem appropriate in that there was every indication from the record that this defendant intended to sell each and every of his coins. He used the court, the court used the same 23% haircut on those other coins as assuming it would be the same sort of transaction as this deal in the parking lot. Yes, Your Honor, that's accurate. That's an accurate statement of what the district court did. Thank you. Judge Porter, anything else? No, thank you. Judge Bevis? No. Thank you very much. May I make one comment, Your Honor? This is your rebuttal time, my friend. Thank you very much. I just want to comment on this impossibility issue as raised in the application note. The fact that there might be some impossibility aspects to a record does not solve the initial problem of what the actual subjective intent of the defendant was. And I think if you look at the two examples that the Sentencing Commission puts in the application note, which all of us, I think, can agree in the wake of Nassar, we need to look carefully at the wording, both of the agency regulation and guideline and the application note, and apply the doctrine of lenity when we should. But if you look at the two examples that they give, the one is a sting operation where there's no question for the defendant to be found guilty or to plead guilty. He has to agree that he assented to a particular plan to steal a particular sum. It's a mythical, fictional amount that never existed. It would be impossible for them to actually impose that loss. But he signed on to a plan to do that. I mean, in the same kind of way that you can say about Mr. Gievers, he signed on to the maximum face value of all the checks he deposited, and he wrote them. He put the numbers on there. When we get to a second example of impossibility, I think it's the insurance claim where there's a fire at a business or property. The owner files an insurance claim for $300,000. It turns out he has only a $200,000 policy. And he wants to argue that the maximum he could have imposed as a loss would be the $200,000. And the court says, no, we have the evidence of your intent right here. This is what you meant. You filled out the insurance claim. That's what we're going to go with. Our impossibility and intent necessarily mutually exclusive. In other words, couldn't the impossibility of pulling off a heist like this bear upon Mr. Kirshner's subjective intent? Oh, absolutely. I think the tremendous amount of difficulty makes it quite unlikely that somebody would actually form that intent. Absolutely. I agree with you on that. That's all I had. Thank you very much, Your Honor. Thank you very much. Judge Bevis, any questions? Nothing further. Counsel, thank you very much. Thanks for your briefing. Thanks for your argument. And we'll circle back to you shortly. Thank you. Thank you, Your Honor. Have a good day.